UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

19-CV-_____

| | |
|---|---|
| JOHN DOE, | ) |
| | ) |
|     Plaintiff | ) |
| | ) |
| v. | ) |
| | ) |
| CLARK UNIVERSITY, DAVID P. ANGEL, | ) |
| Ph.D,NADJA JOHNSON, Ph.D., LYNN S. | ) |
| LEVEY, ADAM J. KEYES, HOLLY DOLAN, | ) |
| EVETTE WALTERS, JEFFREY McMASTER, | ) |
| CHERILYN BONIN, and JANE SMITH, and | ) |
| DAVIS BAIRD, PROVOST. | ) |
| | ) |
|     Defendants | ) |

VERIFIED COMPLAINT AND DEMAND FOR JURY TRIAL

*INTRODUCTION*

1.    This is an action by a Clark University freshman for injunctive relief and damages, arising from gender based discriminatory and defamatory conduct of the defendants in prosecuting a false accusation of sexual misconduct against the plaintiff via summary proceeding without fundamental rights of basic fairness. After erroneously labeling him a sexual offender, Clark and its agents imposed sanctions including "training" premised on the false premise of his guilt; now, on his refusal to offer written confessionals about impacts of "the event" and what "you have learned from this experience," they have terminated his enrollment and housing as of the end of the current academic year.

2.    A female student who had consensual sex with the plaintiff falsely accused him of removing the protection during their encounter and inseminating her. The procedure by which her claim was adjudicated, the outcome, and the sanctions reflect gender bias of Clark and its agents against the rights of males accused of sexual misconduct.  As a result plaintiff has been and continues to be deprived of equal access to educational opportunity at Clark and is facing grievous harm to his reputation and his future education and career prospects.

3.    As a direct and proximate result of the foregoing, and because word of this matter was wrongfully leaked to other Clark students, plaintiff is suffering unjustified disgrace, humiliation and loss of his good name and reputation, distraction, worry,

and uncertainty as to his future, mental anguish and emotional harm, and losses of time and money expended in his defense.

4.  Besides compensatory damages plaintiff seeks a permanent injunction nullifying finding and sanctions and requiring Clark to purge all records of the accusation and related proceedings, findings, and discipline.  While the action is pending he asks the Court to suspend the training sanction and related disciplinary proceedings.  The plaintiff does not seek to disturb Clark's order barring contact between him and the student who complained against him.

*PARTIES*

5.  The plaintiff, referred to herein by the pseudonym John Doe ("Doe") resides in Massachusetts and at all pertinent times he was, and to date still is, a full-time student in his freshman year at Clark University residing in the City of Worcester, Worcester County, Massachusetts.

6.  The defendant Clark University ("Clark") is a private, liberal arts university supported in part by federal grants.  Clark was chartered by the Commonwealth of Massachusetts in 1877, and has its campus and primary place of business located at 950 Main Street, City of Worcester, Worcester County, Massachusetts.

7.  The defendant David P. Angel, Ph.D., ("Angel") is and at all pertinent times was the President of Clark University, and he resides at 130 Woodland Street, Worcester, MA, Worcester County, Massachusetts.

8.  The defendant Nadja C. Johnson, Ph.D., ("Johnson") is and at all pertinent times was assistant Dean of Student Services at Clark and she resides at 27 Wachusett Street, Worcester, Worcester County, Massachusetts.

9.  The defendant Lynn S. Levey, J.D., ("Levy") is and at all pertinent times was Clark's Title IX coordinator and assistant dean for wellness, and she resides at 73 Moore Avenue, Apartment 2, in the City of Worcester, Worcester County, Massachusetts.

10.  The defendant Adam J. Keyes ("Keyes") is and was at all pertinent times Associate Dean of Students and Deputy Title IX coordinator at Clark, and he resides at 97 Bjorklund Ave. Worcester,  Worcester County, Massachusetts.

11.  Holly Dolan ("Dolan") is and at all pertinent times a professor of education practice and deputy Title IX coordinator at Clark, and she resides 25 Azalea Lane, Grafton, Worcester County, Massachusetts.

12. The defendant Evette Walters ("Walters") is and was at all pertinent times the Associate director of Clark's Academic Advising Center and she resides at 61 Dorchester Street in the City of Worcester, Worcester County, Massachusetts.

13. The defendant Jeffrey McMaster ("McMaster") was at all pertinent times Clark's Director of Student Accounts and he resides at 298 Mattakeesett Street, Town of Pembroke, Plymouth County, Massachusetts.

14. The defendant Cherilyn Bonin, M.S. ("Bonin"), is and was at all pertinent times a student success specialist at Clerks Student Support Services office and she resides in 76 Elm Street, Apt. A6 Worcester, Worcester County, Massachusetts.

15. The defendant Davis Baird, ("Baird"), is and was at all pertinent times the Provost and Vice President for Academic Affairs at Clark University and he resides in 15 Montclair Drive, Worcester, Worcester County, Massachusetts.

16. Jane Smith ("Smith") is a resident of the state of New York and was at all pertinent times, and on information and belief still is, a full-time undergraduate student at Clark.

*JURISDICTION AND VENUE*

17. This action is brought under Title IX of the Educational Amendments of 1972 (20 U.S.C. § 1681 *et seq.*) ("Title IX") and under state law.

18. This Honorable Court has original jurisdiction of the federal question pursuant to 28 U.S.C. § 1331 and pendant jurisdiction of the state law claims pursuant to 28 U.S.C. § 1367

19. Venue is proper under 28 U.S.C. § 1391 because the acts and omissions which gave rise to the suit occurred in this district and all parties reside in the district.

*FACTS*

20. Each of the previous paragraphs is incorporated as if fully set forth herein.

## THE ENCOUNTER BETWEEN DOE AND SMITH

21. On or about August, 23, 2018, a week before the start of fall semester classes, Doe arrived at the Clark campus as an entering freshman to attend a week-long orientation program.

22.     Smith was a returning sophomore Clark employed, trained, and was assigned to be Doe's peer guide and mentor for orientation and throughout the following academic year.

23.     After classes began Doe and Smith had several friendly encounters and kept in touch.

24.     Shortly after midnight on Saturday, September 22, 2018, Doe and Smith exchanged a number of text messages and made plans to get together.  Both of them had consumed alcohol, and she texted him, "Dude I'm drunk . . ."

25.     Smith invited Doe to meet her near her dorm on the Clark Campus, then invited him inside and brought him to her bedroom.

26.     As they became intimate Smith made it clear she was agreeable to having sex with Doe and asked him if he had a condom. Doe told her he did.

27.     They reclined on her bed and had vaginal sex in the missionary position, then with Smith bent over and Doe behind her.

28.     Doe lost his erection and when Smith offered him oral sex he removed the condom and she proceeded to perform fellatio.

29.     Doe regained an erection and, as Smith observed, he put the second condom on before the vaginal intercourse resumed, this time with Doe lying on his back with Smith straddling him in a kneeling position.

30.     During this third sexual interaction Doe again began to lose his erection and he feigned an orgasm so Smith would not expect him to continue having intercourse.

31.     Shortly after this Smith got off of Doe and he removed the condom.

32.     On seeing Doe without the condom on, Smith questioned whether he had removed it during intercourse and he assured her he had not. She questioned him repeatedly, he emphatically repeated his assurances, and at length it seemed to him that she believed him.

33.     Smith, while questioning Doe as to whether he had a condom on during each instance of vaginal intercourse, did not tell him that she sensed or felt Doe had inseminated her.

34.     In fact Doe did not ejaculate at any time during his sexual encounter with Smith.

35.     They parted cordially and Doe returned to his dorm on campus.

4

36.     On Saturday afternoon, Doe texted Smith "Hey, you good?"

37.     Three hours later, after Smith failed to respond, Doe texted her again to ask if he could stop by her dorm to retrieve his belt which he had forgotten in her room.

38.     Smith responded "Come now."

39.     Doe arrived at the dorm and Smith came to a window in her room to speak with him as he stood outside.

40.     Smith told Doe, and repeated later by text, that she had obtained a "morning after" contraceptive at a cost of 68 dollars, and wrote in the text, "I expect the money by Tuesday absolute latest.  It is not fair that only I am expected to pay for what you did.  What you did is not only unforgivable but non-consensual (which you would have learned all about if you didn't skip all of your meetings during seek one.) I have every right to go to the school and report you. don't [sic] give me another reason to."

41.     Doe had not skipped the orientation training on sexual consent and sexual misconduct.

42.     Doe again told Smith he had not had intercourse with her without a condom and had not ejaculated inside of her.

43.     Doe told Smith there was no need for the morning after contraceptive, but at length handed her cash for a portion of the expense.

44.     He reluctantly agreed to pay part of the morning after contraceptive cost because he felt he was being blackmailed by Smith.

45.     Smith refused to return Doe's belt, and they parted on bad terms, each expressing a desire to have no further contact with the other.

### SMITH'S TITLE IX COMPLAINT

46.     A week later, on October 1, 2018, Keyes and Dolan wrote Doe that "[y]ou are being reviewed for the possible perpetration of _sexual exploitation_ and _sexual assault_ violations against [Smith]." (Emphasis in the original.)

47.     As a result of Smith's complaint, Doe became the object of a sexual assault complaint process at Clark that had changed drastically in the immediately preceding years, including elimination of such essential elements of basic fairness as: the right of an accused to have access to the details of the complaint against him and to the complete record of a complaint and its investigation; the right to

question his accuser, and the right of representation on the judging panel by peers of the accused.

48.     The said rights, while they were eliminated for males accused of sexual misconduct, remained undisturbed for those accused of offenses -- including violent offenses -- not involving sexual misconduct.

49.     In some respects Clark's abandonment of basic fairness for targets of sexual misconduct accusations fit in with a national trend.  As a justice of this Honorable Court observed recently, "[i]n recent years, universities across the United States have adopted procedural and substantive policies intended to make it easier for victims of sexual assault to make and prove their claims and for the schools to adopt punitive measures in response. That process has been substantially spurred by the Office of Civil Rights of the Department of Education, which issued a "Dear Colleague" letter in 2011 demanding that universities do so or face a loss of federal funding.  *See* Russlynn Ali, Office for Civil Rights, U.S. Dep't of Educ., Dear Colleague Letter: Sexual Violence (Apr. 4, 2011) http://www2.ed.gov/about/offices/list/ocr/letters/colleague-201104.pdf  ('Dear Colleague Letter')." *Doe v. Brandeis*, 177 F.Supp. 3d 561, 572. (See Exhibit 10 hereto for the "Dear Colleague" letter.)

50.     Regarding infringements on the right of representation the same judge noted that "[p]resumably, the purpose of that limitation was to spare [the accuser] the experience of being subject to cross-examination. While the protection of victims of sexual assault from unnecessary harassment is a laudable goal, the elimination of such a basic protection raises profound concerns." *Id.* 604-05.[1]

51.     After Doe was notified of the investigation Keyes and Dolan interviewed him to obtain his account of the encounter with Smith; they provided him with no specifics or documentation of Smith's allegations.

52.     Approximately a week later Doe met asked to see Keyes again and when they met after repeated requests Keyes informed Doe him verbally of the gist of Smith's claim i.e., that without her consent Doe had vaginal intercourse with Smith without a condom and had ejaculated into her vaginal tract.

53.     To date neither Doe nor anyone on his behalf has seen or has been provided a copy of Smith's written complaint nor any other documentation of Smith's allegations at the time she made the complaint.

---

[1] The loss of the ability to cross-examine is critical when the issue is the credibility of the accuser.  In that sense cross examination is essential to a fair hearing.

54.    Previously, in 2013 Clark handled sexual misconduct complaints by the same
       process it used for other types of student misconduct complaints; policy required
       that a student accused of any offense "will be provided with a written statement of
       the complaint and will be given access to a copy of all relevant materials."
       **Exhibit 1,** Campus Security and Fire Safety Report 2013, Procedures for Campus
       Disciplinary Action, 19-20.

55.    The board that acted on sexual misconduct and other complaints included student
       members.

56.    The following year Clark changed its policy so as to take sexual misconduct
       complaints out of the university's regular disciplinary system and have special
       sexual misconduct boards, which did not include students, deal with them.  But
       the new policy continued procedures allowing students accused of sexual
       misconduct to have access to copies of all relevant materials**.  Exhibit 2**, Campus
       Security and Fire Safety Report 2014, Procedures for Campus Disciplinary
       Action, 22-3.

57.    In 2015 Clark established separate procedures for sexual misconduct complaints,
       as opposed to other disciplinary matters; both sets of policies, rather than
       guarantee access to copies of a complaint record, provided for "access to review
       the full case file prior to the hearing" at which a board would rule on a complaint.
       **Exhibit 3,** Annual Security and Fire Safety Report 2015, University Judicial
       Board Procedure, 28-9; Sexual Offense Hearing Board, 20-32

58.    In 2016 Clark revised policy again, limiting the right of review to an investigative
       report rather than the entire case file for sexual misconduct complaints while
       preserving the right of access to the complete file for other types of complaints.
       **Exhibit 4**, Annual Security and Fire Safety Report 2016, University Judicial
       Board Procedure, at 27 ¶4; Sexual Offense Hearing Board, Procedure, at 29 ¶3.

59.    The Clark student handbook for the 2017 academic year included the complete
       Clark policy stating the procedures for dealing with sexual assault complaints
       against students. **Exhibit 5,** student handbook 2017-18, at 31-35.

60.    When Doe arrived in August 2018 as a freshman student, the student handbook
       for that year contained only a 5-paragraph summary of the process for dealing
       sexual assault complaints. **Exhibit 6**, student handbook 2018-19, at 40.

61.    Unlike the sexual misconduct policy, the policy governing other types of
       complaints was fully set forth completely in the 2018 student handbook, and
       unlike the sexual assault policy, this policy provided for inclusion of student
       members on the boards that ruled on complaints, it provided for an accused

student to have access to the complete case file and to have the right to question the accuser at a hearing.

62.  The 2018 student handbook did inform students that sexual assault cases were handled under a different procedure than complaints of other offenses.

63.  At no time was Doe given actual or constructive notice that he could be subject to disciplinary procedures other than those set forth in the 2018 student handbook.

64.  Clark was contractually obligated to advise and provide this information to Doe.

65.  At all pertinent times there was no basis for Clark or its agents to reasonably expect that Doe understood or had agreed he could be judged responsible for any serious offense, including sexual offenses, on the basis of proceedings in which he was not given timely notice of the specific fact allegations against him, not given the benefit of a fair and impartial investigation, not given access to all relevant materials, not given adequate time to prepare his defense, not given the opportunity to question the lone witness against him, and in which he would be judged by a board including none of his peers.

66.  To the extent, if any, that the 2018 student handbook put Doe on actual or constructive notice that Clark had special procedures for dealing with complaints of sexual offenses that were different from the procedures that applied to non-sexual offenses, such notice indicated that the special procedures applied only to complaints of sexual violence as opposed to other types of sexual misconduct.

67.  On October 23, 2018, Doe and his attorney were permitted to review, but not to have a copy of, a report by Keyes and Dolan summarizing their investigation. All evidence, notes, or other material from the investigation, including taped interviews were withheld.

68.  The Keyes-Dolan report dealt only with the charge of sexual exploitation; the sexual assault accusation had been dropped without notice or explanation to Doe.

69.  On November 16, 2018 Clark University convened a Sexual Offense Hearing Board to decide only the sexual exploitation claim.

70.  While in 2014 policy stated that "Clark's judicial process requires that complainants and respondents have an opportunity to question each other in the presence of the board during any hearing" and in 2015 accused and accuser could still pose questions through the board chair, by 2018 there was no right of examination at all. **Exhibit 2** at 22-3;  **Exhibit 3** at 31;  **Exhibit 7**, Process for Resolving Complaints of Sexual Offenses Involving Clark University Students, at 5-6, Convening the Sexual Offense Hearing Board.

71.     Doe's hearing board in 2018 included Dr. Nadja Johnson, assistant dean of students, who served as a non-voting chair.  The three voting members were Evette Walters, associate director of academic advising, student success specialist Cherilyn Bonin, and Jeff McMaster, director of student accounts who substituted a male member of the board at the last moment.

72.     No students or tenured faculty were voting members of the panel.  On information and belief the three voting members were each at-will employees of Clark.

73.     True to the Clark policy, Doe was not entitled to confront and cross examine the accuser or even to pose question to her through the board chair.

74.     On information and belief Walters, Bonin, McMaster's, Levey, Johnson Baird and Angel had little training on gender discrimination and on Title IX.

75.     Though Doe was permitted to bring an attorney to the hearing, he had no right to representation. The lawyer was a silent observer, not permitted to participate in any way and Doe was not allowed to cross-examine Smith.

76.     On November 21, 2018 Johnson wrote Doe informing him that he had been found responsible of violating the Sexual Exploitation provision of Clark's Sexual Offense policy.

77.     The letter failed to articulate the basis, grounds or reasoning for their decision – it was penned by Dr. Johnson, and informed Doe that "[t]his letter serves as a written confirmation of their decision."

78.     Clark's policy defined sexual exploitation as occurring "when a person takes non-consensual or abusive sexual advantage of another for their [sic] own advantage or benefit, or to benefit or advantage anyone other than the one being exploited, and that behavior does not otherwise constitute Sexual Assault, Sexual Misconduct, or Sexual Harassment. Examples of Sexual Exploitation include, but are not limited to: making public sexual activity with another person without that other person's consent; prostituting another person; non-consensual video- or audio-taping of sexual activity; going beyond the boundaries of consent (such as letting your friends hide in the closet to watch you having consensual sex); voyeurism; and/or knowingly transmitting an sexually transmitted infection (STI) or HIV to another person."

79.     Johnson's letter also informed Doe that his sanctions for this offense would include being barred from student leadership positions for a year, a one-year no-contact order as to Smith and participation in remedial training by Levey, the Title IX coordinator.

80.     To all intents and purposes this decision was final; the only grounds for appeal were procedural error or newly discovered evidence.  Under its policy Clark refused to consider appeals on grounds that the board decision was erroneous, unfair, arbitrary and capricious, or unsupported by the evidence or that the Board had failed to permit cross-examination of Smith.

81.     Doe's appeal letter to Levey, Clark's Title IX coordinator and Assistant Dean of Wellness spelled out his grounds for appeal which included without limitation, the lax standard of proof of preponderance of the evidence and the proposed regulations issued by the United States Dept. of Education under Title IX at 106.45(b)(3)(vii) and the need for cross-examination. i.e. "For higher institutions, the recipient's grievance procedure must provide for a live hearing.  At the hearing, the decision-maker must permit each party to ask the other party and any witnesses all relevant questions and follow-up questions, including those challenging credibility.  Such cross-examination at a hearing must be conducted by the party's advisor of choice, notwithstanding the discretion of the recipient under paragraph (b)(3)(iv) of this section to otherwise restrict the extent to which advisors may participate in the proceedings. If a party does not have an advisor present at the hearing, the recipient must provide that party an advisor aligned with that party to conduct cross-examination. All cross-examination must exclude evidence of the complainant's sexual behavior or predisposition, unless such evidence about the complainant's sexual behavior is offered to prove that someone other than the respondent committed the conduct alleged by the complainant, or if the evidence concerns specific incidents of the complainant's sexual behavior with respect to the respondent and is offered to prove consent. At the request of either party, the recipient must provide for cross-examination to occur with the parties located in separate rooms with technology enabling the decision-maker and parties to simultaneously see and hear the party answering questions. The decision-maker must explain to the party's advisor asking cross-examination questions any decision to exclude questions as not relevant. If a party or witness does not submit to cross-examination at the hearing, the decision-maker must not rely on any statement of that party or witness in reaching a determination regarding responsibility."[2]

---

[2] Proposed Title IX regulations at 34 CFR Part 106 Title IX of the Education Amendments of 1972.

82.    Indeed the proposed regulations -106.45(b)(3)(viii): "requires institutions to provide a live hearing, and to allow the parties' advisors to cross-examine the other party and witnesses. If a party does not have an advisor at the hearing, the recipient must provide that party an advisor aligned with that party to conduct cross-examination. Cross- examination conducted by the parties' advisors (who may be attorneys) must be permitted notwithstanding the discretion of the recipient under subsection 106.45(b)(3)(iv) to otherwise restrict the extent to which advisors may participate in the proceedings. In the context of institutions of higher education, the proposed regulation balances the importance of cross-examination with any potential harm from personal confrontation between the complainant and the respondent by requiring questions to be asked by an advisor aligned with the party."

83.    Doe's appeals were denied including two last appeals directly to Provost and Vice President, Baird and by President Dr. Angel, i.e., Clark's counsel responded the proposed regulations are "…[i]n no way binding upon institutions." "The University retains the right to (sic) right to refer your client to its student conduct processes if he does, in fact, continue to disregard the University's assigned sanction."

84.    On February 6, 2019, Levey wrote Doe stating his first assignment for his training would be a short essay of 500-600 words in which he should "consider who was hurt by the event that was reviewed by the Hearing Board. Be specific in your account.  That is, while you will likely discuss how you and perhaps the Complainant (though not required) in the case were harmed, you may also want to consider who else was effected by this event.  Be specific, detailed and reflective. . . Once I receive the paper, I will email you a time for us to review the contents together." **Exhibit 8**, Levey letter to Doe, February 6, 2019.

85.    Levey set a deadline of February 14, 2019, for the assignment and advised Doe that his failure to comply could lead to further disciplinary action.

86.    Doe had no objection to the no-contact order and accepted the ban on his holding leadership positions.  However, because he did not believe his encounter with Smith harmed or affected anyone, and because he considered the assignment to be falsely premised on the validity of the sexual exploitation finding he did not write the paper Levey called for.

87.    For this he was brought before Clark's University Conduct Board, which deals with non-sexual offenses, for disobeying Levy, and on March 29, 2019, Doe was found responsible for this offense.

88.    On that date Kate Cassidy, the chair of that board, wrote informed Doe that his student account has been frozen so that he cannot sign up for next fall's classes,

unless he completes Levey's assignment by April 12, 2019, and writes another longer paper by April 26. **Exhibit 9**, Cassidy letter to Doe, March 29, 2019.

89.     Cassidy wrote that this paper must:

A. Reflect on your values system: What experiences have shaped your values? Provide specific examples. What purpose do those values serve in your life?
B. How do these values play out in your day-to-day life?
C. How do you know that people recognize what your values are? How do people see your values as an extension of you as a person?
E. What is the most important thing you have learned from this experience in regards to your values system?

90.     The letter stated that the additional paper "may not serve to justify your own actions or evaluate the actions of others. . . . I do hope that this experience has been a learning experience and that you will reflect on these actions moving forward in order to make better decisions."

91.     Besides being barred from registering for fall semester classes, Cassidy warned, that if Doe is found responsible for additional violations he may face additional sanctions including "separation from the university."

92.     Cassidy's letter did not mention that the hold on Doe's account also keeps him from signing up for housing for the fall semester.

93.     According to Clark policy accusations of sexual misconduct are to be handled on a strictly confidential basis actions.  Nevertheless word of the complaint and the resulting sanctions on Doe has gotten out among the student body, on information and belief thanks to Smith.

**CLARK'S ERRONEOUS OUTCOME ON GENDER BIAS GROUNDS**

94.     The board's and Defendants' findings that Doe was responsible for sexual exploitation of Smith is false and erroneous.

95.     Clark and its agents engaged in erroneous disciplinary conduct against Doe, labeled him a sex offender, created a hostile environment against him, and impaired his educational and career prospects, because of his gender.

96.     At all pertinent times Clark and its agents observed the rights to basic fairness of female students, faculty, or staff accused of misconduct to a far greater extent than they did to the same rights of male students accused of sexual misconduct.

97.　　At all pertinent times a female accused of misconduct had a right to see the statement or complaint against her, to see all records of the complaint and its investigation, to question her accuser, and to have representation of her peers on the panel judging the complaint; male students accused of sexual misconduct had no such rights.

98.　　On information and belief, while those who have reported being the victims of sexual offenses at Clark have not been exclusively female, at all pertinent times the alleged perpetrators of sexual violence have been males, and allegations of other types of sexual misconduct have been against males in the overwhelming majority of cases.

99.　　Upon information and belief Clark's sexual board's findings are infected with systemic gender bias and civil discovery will demonstrate the findings reflect that gender bias.

100.　　Unlike cases of alleged rape or sexual assault in which complainants attest as percipient witnesses to such facts as penetration and lack of consent, Smith did not claim she observed Doe remove his condom or observed Doe without a condom on during or just before sex.

101.　　Based on the limited and incomplete information disclosed to Doe about Smith's fact allegations, she was intoxicated at the time of the encounter and she surmised that Doe had sex with her without protection when she saw he did not have a condom on *after* the sex was over.

102.　　In the last intercourse position Smith was straddling Doe in an upright kneeling posture from which she likely would have observed if he removed the condom; on information and belief Smith stated she was unsure of the sequence of positions.

103.　　Smith claimed she sensed wetness in her genital area that she attributed to Doe ejaculating without a condom.

104.　　There was no physical evidence of ejaculation and no statements or other evidence on which the sexual offenses board could determine even by preponderance of the evidence that what Smith sensed was semen as opposed to vaginal secretions or condom lubricant.

105.　　Put differently, the Defendants' findings of sexual exploitation against Doe rested exclusively on Smith's uncorroborated testimony that she had vaginal secretions, i.e. that her vagina was wet.

106.　　The board's decision finding Doe responsible for sexual exploitation of Smith rests not on physical evidence but solely on a credibility determination in favor of

Smith, who was intoxicated at the time she had intercourse with Doe and whose claim rests on inference (at best) or conjecture, rather than Doe, who has actual knowledge.

107.   In investigating Smith's complaint against Doe Keyes and Dolan or the other Defendants' did not carefully scrutinize Smith's basis for the knowledge she claimed as to Doe having sex with her and ejaculating without a condom; the investigation was not impartial and was biased against Doe.

108.   In making its decision, the board did not have the benefit of detailed and careful examination of Smith as to her account of the encounter and as to the timing and nature of the perceptions on the basis of which she reported her belief Doe had ejaculated without protection.

109.   This was because, as a matter of policy, Keyes and Dolan mounted a cursory investigation whose objective above all else was not to importune the complainant and to move the sexual complaint process quickly towards a conclusion.  As Keyes stated in a 2017 interview with the *Scarlet* student newspaper, investigations of sexual misconduct were tailored to the needs of complainants. "[W]e've tried to create a very survivor-centric process that allows for a person to meet as minimal a number of times [as possible] with as minimal a number of people," Keyes stated.

110.   In making its decision against Doe the board did not have the benefit of any disclosed expertise in medicine to help evaluate Smith's claims.

111.   The decision of the board finding Doe responsible for sexual exploitation of Smith was unsupported by the evidence and occurred because of gender bias against Doe; it was a decision to "believe the victim" because of her gender rather than apply the standard of proof by a preponderance of the evidence.

112.   The decision of the board finding Doe responsible for sexual exploitation of Smith was the result of a biased belief, wholly lacking in support from the evidence, that because of her gender Smith's perceptions and her conjectural inference against Does were more reliable than his percipient account.

113.   The board's decision is evidence of the bias of its members against Doe because of his gender.

114.   Further evidence of the gender bias of the individual defendants is the willingness of each of them to countenance procedure in the handling of sexual assault complaints that dispensed with the rights of the accused to basic fairness in blatant contrast to the preservation of such rights in cases of even the most serious non sexual assault cases.

115.   Levey, Clark's highest ranking Title IX Administrator, has evinced biased against accused male sex offenders due in part to her professional experience with sexual violence against women.

116.   Sexual violence against women is an extremely serious and disturbing form of misconduct; it is virtually the exclusive preserve of men, many of whom offend repeatedly against more than one victim, which results in overwhelming evidence of guilt when such perpetrators are called to account.

117.   Levey, a graduate of Clark, told the *Scarlet* student newspaper reporter in 2017: "Since I was a student at Clark I've been interested in violence against women and violence prevention."

118.   Before joining Clark as its Title IX coordinator in 2017 Levey, who has a law degree, worked at the National Center for State Courts on compliance with the Violence Against Women Act, which promotes the investigation and prosecution of violent crimes against women.

119.   Levey, as title IX coordinator, was at all pertinent times the Clark administrator in charge of the university's efforts to respond rapidly to sexual assault complaints and, with little regard for the rights of the accused to basic fairness, to get results.

120.   This imperative informed Levey's direction of her deputies, Keyes and Dolan, and her direction of Title IX training programs for sexual offense board members and numerous other faculty and staff of the university.

121.   Besides their own biases, the individual defendants were each employees of, and economically dependent on, Clark University, and as such they were influenced s by the institutionalized bias of their employer.

122.   At all pertinent times Clark and its agents were under pressure from the federal government and also from Clark students to quell the occurrence of male perpetrated sexual violence among its students.

123.   To show results and resolve, Clark, Dr. Angel, and his subordinates deliberately subordinated the rights of accused sex offenders to the administrative imperative of protecting the university's federal funding and the political imperative of mollifying students and others outraged by sexual violence against women.

124.   In 2011 the U.S. Department of Education Office of Civil Rights ("the department") informed schools and universities that failure to act on complaints of sexual assault or harassment would be treated as discrimination against women and girls, banned under Title IX of the Education Amendments act of 1972.

125. The department warned Clark and other institutions that failure to remedy a discriminatory lack of response to sexual assault and sexual harassment of women could result in the loss of funding.

126. On the other hand the Education Department offered, and Clark took advantage of, funding for programs to prevent or punish sexual misconduct, including support for increased university staffing to investigate and punish it.

127. At all pertinent times Clark, Angel and other administrators of the university were aware the department had launched investigations against various institutions of higher education regarding failure to punish perpetrators of sexual assault and sexual harassment because of bias against the female victims.

128. The department required schools like Clark to prosecute and sanction perpetrators administratively, using a more lenient standard of proof -- by a preponderance of the evidence -- rather than the clear and convincing standard that many institutions favored.

129. Clark went further than this by downgrading and removing procedural protections essential to basic fairness for the accused, as set forth above, in order to achieve rapid processing of complaints and imposition of sanctions on accused perpetrators.

130. The university sponsored a variety of programs to prevent and respond to sexual assaults and other sexual misconduct, and it often did so it in a manner tending to promote a presumption of guilt against accused males and bias against their rights to basic fairness.

131. Clark sought and received a grant from the Education Department to establish the Clark Anti-Violence Education ("CAVE") program which characterized sexual assault on its students as "epidemic."

132. In 2015, the year after President Obama launched his "It's On Us" campaign to mobilize students, educators and administrators against sexual assault, Clark produced and distributed its *It's On Us* video.
https://www.youtube.com/watch?v=Y0bdwSmstNM

133. The video is a series of shots of Clark students, professors, and administrators (including President Angel and Keyes) making a series of statements including "It's on us to never blame the victim" and  "It's on us to stop sexual assaults any way we can."

134.   The takeaway from the "It's on Us Video" is captured by one of the participants students who states: "Never blame the victim" which in turn has continuously infected Clark's investigative procedures with gender bias.

135.   Also in 2015 Clark presented documentaries on sexual assault with such titles as "It Was Rape" and "The Hunting Ground" calling stridently for a crackdown on sexual offenders.  Keyes, then Clark Director of Residential Life and Housing and chair of what was then called the Sexual Misconduct Disciplinary Board, promoted showings of "The Hunting Ground."

136.   Starting in 2015, again at the behest of the U.S. Department of Education, Clark added a Title IX coordinator and two deputy coordinators to its staff to focus on preventing and prosecuting sexual offenses.

137.   In creating education programs, media productions, posters and written materials, and revising policy on sexual offenses Clark administrators and advocates typically referred to a complainant as "the victim," thereby advancing the premise without scrutiny or adjudication that the accused is a sex offender.

138.   Clark took the foregoing and other actions under pressure not only from the Department of Education but under public criticism from some of its students.

139.   An article under the headline "Students Frustrated with University's Approach to Sexual Assault" was featured in *The Scarlet,* Clark's student newspaper, April 23, 2015; it reported on students who claimed the university was not responding adequately to sexual assaults, and called for a "naming and shaming" campaign against rapists.

140.   Consistent with Clark's concern over perceptions of this issue, the foregoing article has been removed from *The Scarlet's* website due to "concerns about the accuracy of the reporting in this article," according to a notice posted in its place, which goes on to state: "We want to thank everyone who brought this to our attention, and [assure] our readers that we are discussing every step of the writing and editing process in order to ensure that similar mistakes are not made in the future.  We apologize for the confusion this article caused." https://thescarlet.org/12872/category_news/students-frustrated-with-universitys-approach-to-sexual-assault/

141.   The same month in which the original article appeared a Clark sexual offenses board ordered the expulsion of a freshman student accused of raping another freshman.

142.   In August of 2015 the expelled student sued Clark, Keyes and several other Clark administrators in the central district of the Massachusetts federal district court.

*Doe v. Clark University, Davis Baird, Dennis Darrigrand, Adam Keyes, Sarah Bergeron, Jacqueline Capomacchio*, Case No. 4:15-cv-40113-TSH, [6] Complaint (D. Mass. Aug. 14, 2015).

143.   The expelled student claimed Clark and its agents gave his accuser preferential treatment "because she is a female," treated her charges as true from the outset, and moved immediately to ban him from the campus and to expel him without investigating or allowing him time to mount a defense.

144.   The expelled student claimed that after the sexual offense board ordered his expulsion he was able to obtain evidence casting doubt on his guilt but Angel refused to consider it and denied his appeal.

145.   The suit alleged violations to 20 U.S.C. §1681 (Title IX), breach of contract by Clark, failure to observe requirements for basic fairness in handing of the rape allegation, and a number of other common law claims.

146.   The lawsuit noted that different policy statements of Clark were in conflict as to whether the university judged sexual misconduct allegations under a "preponderance of the evidence" standard (i.e., likely than not) or the more exacting "clear and convincing evidence" standard.  On the other hand it was clear allegations of non-sexual offenses, including violent offenses, were then judged under the clear and convincing standard.

147.   When the student and complainant went before the sexual offense hearing board, the lawsuit claimed, he was effectively denied the right to question his accuser because the panel chair, Keyes, required that the questions go through him and in that process he altered some of the questions and simply refused to ask many of others.

148.   Without beginning the discovery process, in November of 2016 Clark and the student settled the lawsuit on undisclosed terms.

149.   In 2017, according to a reporter for *the Scarlet*, at a counseling center of Clark treating sexual assault victims "like many offices at Clark, they always believe that what the [complainant] student is saying is true."

150.   Megan Kersting, director of a counseling center at Clark that provide treatment to sex assault victims, told the reporter that using the separate procedures Clark set up for prosecuting accused sex offenders "can be empowering" for victims.

151.   "It's not a perfect process, but it is faster [than criminal prosecution]" the reporter quoted Levey as stating. Levey added that "[i]t's really up to the victim survivor because they're driving the train to decide how they want to approach it."

152.   Clark mounted training programs for its expanded Title IX staff that promoted shortchanging the rights of accused males, and it designated many on its staff as "responsible employees" and trained them in how to work with complainants and bring their cases to Levey's office.

153.   Peer advisors, including on information and belief Jane Smith, were designated responsible employees and were trained in Clark's Title IX sexual offense procedures.

154.   In her capacity as peer adviser to the plaintiff, Smith was at all pertinent times an employee of Clark.

155.   As a direct result of the foregoing the plaintiff has been harmed in his reputation and good name, humiliated, erroneously labeled a perpetrator of sexual exploitation, suffered great pain of body and mind, has been impeded in his pursuit of an education and his ability to continue his education is under imminent threat due to the bar against his registering for next fall's courses and the sexual exploitation finding placed in his record.

*COUNT I*
Title IX - Gender Discrimination
All Defendants but Smith

156.   Each of the previous paragraphs is incorporated as if fully set forth herein.

157.   Title IX of the Education Act Amendment of 1972, 20 U.S.C. § 1681, *et seq.* provides that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subject to discrimination under any any education program or activity receiving Federal financial assistance."

158.   At all pertinent times Clark received federal financial assistance for its programs, and in particular for programs dealing with prevention, investigation, administrative adjudication, and sanctioning of sexual misconduct.

159.   In the investigation and resolution of sexual harassment complaints "[p]rocedures . . . according due process to both parties involved, will lead to sound and supportable decisions." *Revised Sexual Harassment Guidance: Harrassment of Students by School Employees, Other Students, or Third Parties,* at 22 (January 2001), https://www2.ed.gov/about/offices/list/ocr/docs/shguide.pdf, viewed April 3, 2019.

160.   At all pertinent times, as a condition of its acceptance of federal funds, Clark could not lawfully, on the basis of gender, "Subject any person to separate or different rules of behavior, sanctions, or other treatment . . . [or] limit any person in the enjoyment of any right, privilege, advantage, or opportunity." " 34 C.F.R. 106.31(b)(4),(7).

161.   At all pertinent times the U.S. Department of Education Office of Civil Rights required Clark, its agents and employees, to provide "prompt and equitable" procedures to resolve complaints of sexual harassment and sexual assault, and required that "the parties must have an equal opportunity to present relevant witnesses and other evidence." **Exhibit 10**, "dear colleague" letter April 4, 2011, by the department's Office of Civil Rights, at 9, 11.

162.   At all pertinent times the department's Office of Civil Rights required Clark, its agents and employees, to provide "adequate, reliable, and impartial investigation of complaints, including the opportunity for both parties to present witnesses and other evidence." *Id.,* at 9.

163.   Because of Doe's gender, when Smith complained against him the defendants failed to conduct an adequate, reliable, or impartial investigation of Smith's allegations.

164.   Because of bias against accused male sex offenders the defendants failed to use equitable procedures in resolving Smith's complaint against Doe.

165.   In failing to allow Doe to pose questions—to cross-examine his accuser Clark and its agents denied him equal opportunity to present witnesses and other evidence.

166.   Clark and its agents, in their proceedings against Doe, did not identify or give notice as to whether a party, investigator, or the board, had the burden of proof to show Doe was responsible for an incident of sexual misconduct.

167.   Clark and its agents failed to apply the preponderance of the evidence standard but instead due to pro-female/anti-male bias credited the unsubstantiated accusation of Smith over the percipient account of Doe.

168.   The finding that Doe was responsible for sexual exploitation of Smith was clearly erroneous, arbitrary, capricious and unsupported by the evidence.

169.   The defendants found Doe responsible for sexual exploitation of Smith because of gender bias against Doe and in favor of Smith.

170.   Clark and its agents were on notice of, and in fact were the purveyors of, the lack of fair process in the proceedings against Doe and as a direct and proximate result thereof they denied Doe equal access to Clark's educational programs.

171.   As a direct and proximate result of the foregoing, plaintiff has been seriously and irreparably harmed and is under imminent threat of continuing and worsening harm in his education, career prospects, earning potential, reputation, his physical and emotional well-being, and other direct and consequential damages.

172.   Title IX is enforceable through an implied right of action affording persons subjected to discrimination on the basis of gender pecuniary damages and equitable relief.

173.   Doe is entitled to declaratory judgment and to a permanent injunction requiring Clark to terminate all disciplinary process against Doe arising directly or indirectly from Smith's accusation and to expunge all references thereto from his record at Clark.

174.   Doe is entitled to recover damages in an amount to be determined at trial plus interest, costs, and attorney fees to the extent provided by law.

*COUNT II*
Breach of Contract
Clark

175.   Each of the previous paragraphs is incorporated as if fully set forth herein.

176.   At all times pertinent hereto a contractual relationship existed and continues to exist between Clark and Doe through the 2018-19 student handbook.

177.   At no time did Clark have a reasonable expectation that Doe was actually or constructively on notice of the procedures Clark would employ for investigation and adjudication of claims of nonviolent sexual offenses.

178.   At all pertinent times Doe had a reasonable expectation that were he to be accused of misconduct, including but not limited to nonviolent sexual misconduct, he would be entitled to notice of the specific fact allegations against him, would have the benefit of a fair and impartial investigation, would have access to all relevant materials, would have the opportunity to question witnesses against him, and would be judged by an unbiased board including his peers.

179.   For all the reasons set forth herein, Clark materially breached its contract with Doe by failing to comply with its obligations, standards, policies and procedures,

set forth in the 2018-19 student handbook and by subjecting Doe to a blatantly arbitrary and capricious disciplinary proceeding and sanctions.

180.    As a direct and proximate result of the foregoing, plaintiff has been seriously and irreparably harmed and is under imminent threat of continuing and worsening harm in his education, career prospects, earning potential, reputation,  his physical and emotional well-being, and other direct and consequential damages.

181.    Plaintiff is entitled to declaratory and injunctive relief as set forth above and to recover damages in an amount to be determined at trial plus interest, costs, and attorney fees to the extent provided by law.

*COUNT III*
Breach of the Covenant of Good Faith and Fair Dealing
Clark

182.    Each of the previous paragraphs is incorporated as if fully set forth herein.

183.    Based on the foregoing facts, Clark has breached and violated the covenant of good faith and fair dealing implied in its contract with Doe by subjecting him to a disciplinary proceeding for a serious offense without basic fairness, without the right to know the details of the accusations, to have access to all evidence and relevant materials, to have representation, to question the adverse witness, and the right to a fair and impartial investigation and to adjudication by a competent and unbiased panel free of gender bias.

184.    As a direct and proximate result of the foregoing, plaintiff has been seriously and irreparably harmed and is under imminent threat of continuing and worsening harm in his education, career prospects, earning potential, reputation,  his physical and emotional well-being, and other direct and consequential damages, and he is entitled to declaratory and injunctive relief as set forth above and to recover damages in an amount to be determined at trial plus interest, costs, and attorney fees to the extent provided by law.

*COUNT IV*
Defamation
Smith, Clark

185.    Each of the previous paragraphs is incorporated as if fully set forth herein.

186.    Smith defamed Doe by claiming he had sexually assaulted and exploited her by engaging in intercourse with her without her consent, given that a condition of her consent was that he use protection.

187. Smith accused Doe of sexual misconduct, repeated this allegation to Keys and Dolan in their investigation, before the sexual offenses board at the hearing, and on information and belief thereafter to one or more third parties.

188. She did so knowing that the accusation was false and defamatory, or with reckless disregard as to its truth or falsity.

189. On information and belief Smith communicated her accusations against Doe and the result of Clark's disciplinary process to third parties in the Clark community. The result has been entered onto Doe's permanent record at Clark, which will likely result in continuing defamation of Doe before educational institutions and potential employers.

190. As a direct and proximate result of the foregoing, plaintiff has been seriously and irreparably harmed and is under imminent threat of continuing and worsening harm in his education, career prospects, earning potential, reputation, his physical and emotional well-being, and other direct and consequential damages, and he is entitled to recover damages in an amount to be determined at trial plus interest, costs, and attorney fees to the extent provided by law.

*COUNT V*
Declaratory Judgment
Clark

191. Each of the previous paragraphs is incorporated as if fully set forth herein.

192. In its treatment of Smith's allegation against Doe, Clark has violated and continues to violate its contractual obligations as well as state and federal law.

193. Doe's education and career opportunities have been severely damaged and without appropriate redress Clark will continue to label and sanction Doe as an adjudicated sex offender, thereby jeopardizing his future prospects for education and employment, whether in the public or private sector.

194. Pursuant to 28 U.S.C. § 2201, Doe seeks a declaratory judgment of this Court finding Clark has breached its legal and contractual obligations to Doe and therefore Doe is entitled to redress that will insofar as is possible make him whole.

195. The redress Doe seeks is a permanent injunction (a) vacating the findings and sanctions placed on Doe by the Sexual Offenses Hearing Board, Levey, and the University Conduct Board; (b) directing Clark to completely and permanently expunge from Does education record all references, notations or other memorialization disclosing Smith's accusation or the resulting investigation, hearing, finding, appeal, sanctions or other disciplinary process arising from

failure to comply with so-called training as part of the sanctions for alleged sexual misconduct; (c) ordering Clark to provide Doe a notarized certification by Angel or other appropriate official that the said finding against Doe has been reversed and all records of it expunged; (d) ordering Clark and its agents to make no disclosure in any manner or form to third parties regarding the accusation and resulting process.

*PRAYER FOR RELIEF*

WHEREFORE, Plaintiff John Doe respectfully requests that this Honorable Court:

a.      Order Clark to vacate, nullify, and withdraw the findings and sanctions placed on Doe by the Sexual Offenses Hearing Board, Levey, Baird and the University Conduct Board;

b.      Award Doe compensatory damages in an amount to be determined at trial including, without limitation, damages for mental pain and suffering, loss of future education prospects and professional career opportunities and earnings, damage to reputation, damages to physical, emotional, and psychological well-being, and other direct and consequential damages;

c.      Award prejudgment interest;

d.      Award attorneys' fees and costs pursuant in accordance to the law of damages for him;

e.      Grant such other relief as the Court deems to be just and proper.

PLAINTIFF DEMANDS JURY TRIAL AS TO ALL ISSUES

Respectfully submitted,

The Plaintiff, by his attorneys,

/s/ *Hector E. Pineiro* _____
Hector E. Pineiro BBO# 555315
Robert A. Scott BBO#648740
Law Office of Hector E. Pineiro PC
807 Main Street
Worcester, MA 01610
508.770.0600
hector@pineirolegal.com

DATED: April 5, 2019

## Verification

I, John Doe, declare as follows:

I am the individual referenced by the pseudonym of John Doe in the attached Complaint and demand for jury trial of *John Doe v. Clark University et al.* dated April 5, 2019, being filed in the U.S. District Court, District of Massachusetts, Central Division, on or about this date by my counsel, Hector E. Pineiro ("the complaint").

I am a citizen of the United States and of the Commonwealth of Massachusetts.

I am an emancipated adult.

I have personal knowledge of myself, my actions, the actions of others in my presence, communications to me, and actions taken and pending against me by Clark University that are set forth and described in the complaint, and if called on to testify I would do so competently as to these matters.

I verify under the pains and penalties of perjury that the factual statements of the complaint regarding the said matters are true and correct.

Executed on April 5, 2019,

_____
John Doe

## Notarization

I, Hector E. Pineiro, attest under the pains and penalties of perjury that John Doe, a person known to me and verfied by Massachusetts driver's license to be the plaintiff in this action, who is referenced therein by the pseudonym of John Doe, before me this April 5, 2019, did sign the above verification and acknowledge the same to me as his free act and deed.

_____
Hector E. Pineiro
My Commission expires 3/14/2025